## THE SOVEREIGN OF THE SEAS.

(District Court, E. D. Virginia. July 17, 1905.)

1. COLLISION—DAMAGES RECOVERABLE—DEMURRAGE DURING THE MAKING OF REPAIRS.

The report of a commissioner fixing the amount of damages recoverable for the injury of a barge in collision considered, and confirmed except as to the demurrage allowed while repairs were being made, which largely exceeded the cost of the repairs. Such award reduced on evidence showing that the repairs could have been made in much less time if the vessel had been taken to a place having proper facilities and equipment.

[Ed. Note.—Demurrage, see note to Harrison v. Smith, 14 C. C. A. 657; Randall v. Sprague, 21 C. C. A. 337; Hagerman v. Norton, 46 C. C. A. 4.]

2. SAME—INTEREST ON DEMURRAGE.

Interest on the amount awarded for demurrage while a vessel was being repaired after collision, while discretionary with the court, will not be allowed prior to the decree confirming the award, where there has been long delay in the prosecution of the suit.

[Ed. Note.—For cases in point, see vol. 10, Cent. Dig. Collision, § 284.]

3. SAME—FINDINGS OF COMMISSIONER—REVIEW.

The rule that the findings of a commissioner fixing the damages recoverable for collision should not be disturbed unless plainly wrong has little application where only a small part of the evidence was taken before the commissioner.

4. SAME.

The fact that the award of damages for a collision made by a commissioner was less than the amount claimed does not entitle the libelant to a more favorable consideration of such award, where his claim was clearly excessive and exorbitant.

In Admiralty.
See 124 Fed. 861.

Whitehurst & Hughes, for libelants.
Bickford & Stuart, for respondent.

WADDILL, District Judge. This case is now before the court on the exceptions filed by the proctors for the libelants and respondent, the Sovereign of the Seas, to the report of Commissioner George E. Bowden, filed herein on the 18th day of January, 1905, ascertaining the damages sustained by the libelants by reason of a collision between their barge the Juniata and the barge Sovereign of the Seas, the question of fault having heretofore been ascertained to be solely that of the Sovereign of the Seas. The commissioner reports the damages to be $3,236.06, and that interest should run from the 3d day of November, 1900. The items making up the total of

$3,236.06 are mainly of three classes, namely, four items aggregating $72.40, costs of survey, cost of protest, and towage charges; the sum of $1,138.66 for repairs, of which $249.74 is for temporary repairs on the barge; and the sum of $2,025 for demurrage pending the making of such repairs, $540 being for demurrage during the making of the temporary repairs, and $1,485 during the making of the permanent repairs. The exceptions of the respondent, the Sovereign of the Seas, raise the question of the propriety of the towage charges, and challenges as well the amount per day allowed on account of the demurrage as the number of days of detention of the Juniata during the making of the temporary repairs at Newport News and the permanent repairs at Philadelphia; and also presents for the consideration of the court whether interest should be allowed as given in said report. The court is disinclined to disturb the items of allowance covered by the first three classes above enumerated, one of which includes towage, as also the amount of $45 per day for demurrage, though $45 per day is quite liberal to the libelants. But the number of days for which allowance is made seems to be out of all proportion to the time that should have been taken to do the necessary work on the injured barge, and this is particularly true of the time allowed for the permanent repairs. The result that it brings about is of itself striking, namely, an allowance for demurrage for the barge of $2,025 while $1,138.66 worth of repairs were being put on it.

The collision occurred on the night of the 17th of February, 1900, at Newport News, Va., and, upon a survey being had, it was determined to make temporary repairs to the Juniata, and accordingly she was taken to the Newport News Shipyard at noon on the 20th of February, and remained there until 10:30 a. m. on the 24th of February. After she commenced loading, on the 27th of February, she sprung a leak, and was returned to the shipyard at 8 o'clock on the morning of the 28th, and the leak was on that day stopped. She was at the shipyard in all 5 days and 3½ hours. It is claimed that by reason of the collision she originally lost her right to a berth for coal, and also lost time by having to leave after she was berthed, to return to the shipyard a second time. The Juniata arrived in port on the 17th of February, 1900, and her master claims that he could have loaded, but for this collision, by the 20th of February at the outside; and that as a matter of fact he did not finish until the 3d day of March, 1900. He was thus detained at Newport News from the 17th of February to the 3d of March, 14 days in all; and the commissioner allowed on account of demurrage 12 days; which is at least 2 days more than should be allowed on the Juniata's master's own showing. Nine days' time would seem to be a full allowance for the demurrage caused by making the temporary repairs. After the completion of this temporary repair, the barge continued in her regular business in the coal trade, without interruption, until the fall of the year 1900, though she leaked some, when heavily laden, from time to time. On the 17th of September, at Philadelphia, it was determined to have permanent repairs made to the barge, and Rylatt & Barrett Dry Dock Company

was employed for this purpose. While the libelants claimed that they should be allowed demurrage from the 17th day of September to the 3d of November, namely, 45 days, at $72 per day, the commissioner only allowed from the 2d of October to the 3d of November, at $45 per day, as the actual days that the barge was undergoing repair as claimed by the libelants. The master of the barge describes the work of making permanent repairs as follows:

"Q. What did those repairs consist of? A. Well, on her starboard quarter her sheathing was taken off, and the plates were repaired. Q. Do you know how many plates were repaired? A. There were three at least, and I think that there were four plates, but I am certain there were three. When these plates had been put on, the sheathing was put back again. Q. After this work was done, was there any trouble with the leaking? A. Well, when we first loaded, there was a little, but not much. Q. Did the work which was done upon the barge in the fall of the year practically stop her leaking? A. Yes, sir; after her first trip. Q. Captain, I wish you would state whether those repairs were necessary to restore the vessel to her former condition. A. Yes, sir; it was necessary. It was necessary they should be done, as the barge was leaking badly, and could not do her work properly until she was repaired."

And David Matticks, the foreman of the Rylatt & Barrett Dry Dock Company, thus described the work that was done:

"Well, we took off the sheathing—the sheathing plank over the iron—so as to allow the repairs to be made to the ironwork which was made in our yard by a gang of men from Neafie & Levy's shipyard here; and after they were through with the ironwork I went back with the gang and had the sheathing put back again."

Just why it should have taken 33 days to do this work upon this barge, the total cost of which was only $888.92, is hard to conceive of. Certain it is no court would be warranted in allowing demurrage for so long a time for doing the work. The barge was not sent to a shipyard that seems to have been equipped for fully doing the work in hand, or at least it did not so do this work, for the woodwork seems to have been done at the shipyard of the Rylatt & Barrett Dry Dock Company, whereas the ironwork was done by a gang of men from another yard, namely, that of Neafie & Levy; and the barge does not appear to have been put in the dry dock, or upon a marine railway, at all, but, on the contrary, as described by the Juniata's master on page 47 of his evidence, as follows:

"Q. In making these repairs in the fall of 1900, was the barge put on a railway or in a dry dock, or, if not, how was the work done? A. No, sir; she was not put on a railway, but in the mud. She would ebb out at low water. She only just floated at high water. Q. Was that a cheap and economical way of repairing her or not? A. Yes, sir; it was. It was much less expensive than if she was hauled out on a railway."

While it may be doubtless true that this method of doing the work was cheaper, it does not follow that it could not have been performed more expeditiously, and it is with the matter of the time it took to do the work that we are now dealing. The libelants reiterate the fact that they were economical in making the repairs, because they did not know at the time on whom the loss would fall, as the fault of the collision had not been settled; but it by no means appears that they were in a hurry in doing the work, as they might not at that time have been busy with their barge; and

if they could be allowed full demurrage for all the time consumed by the slow method adopted of doing the work it would result in quite a remunerative plan of doing business. They are not entitled to and should not receive demurrage for any such length of time as is charged here upon any principle upon which allowances of that character are made. Moreover, the fact that a full allowance for demurrage was made for the time lost in making temporary repairs to the barge should cause only a very reasonable allowance to be made, when it was found that it was necessary to do the work permanently. Experts from some of the leading shipyards were examined, including one from the Newport News Shipyard, as to the time necessary to make the repairs in this case permanent, and they concur in fixing the time from six to eight days. Upon this evidence, certainly, the allowance of 33 days should not be made.

After a careful review of the entire evidence in the case, the conclusion reached by the court is that an allowance of 10 days for the permanent repairs would be the utmost that ought to be given, making in all an allowance for demurrage for permanent and temporary repairs of 19 days, or $855, for doing $1,138.66 worth of work. The commissioner's allowance of $2,025 for demurrage will be disallowed, and in lieu thereof the sum of $855. To allow such an award as $2,025 on a barge of the size and value in question should not be considered seriously, unless under some extraordinary circumstances, which do not appear in this case.

Coming to the question of interest, the exception to the commissioner's report should also be sustained, and interest on the demurrage allowed only as of the date of the decree confirming the report. The allowance of interest upon demurrage is a matter within the discretion of the court, and in this case should only be allowed as of the entry of the decree, instead of the time the claim arose. The length of time which has occurred during the prosecution of this suit would of itself cause the court to hesitate to allow interest even upon the other items covered by the commissioner's report, to the end that the practice of allowing admiralty causes to be prolonged as in this case should be discouraged; and certainly interest will not be given upon the allowance for demurrage.

Counsel for libelants insist that the commissioner's award of $1,485 demurrage during the making of the permanent repairs in this case should be approved, and as a reason urge that the original claim as made was for $3,240, namely, for 45 days at $72 per day, instead of 33 days at $45 per day, as allowed by the commissioner; and, moreover, insist that the commissioner's finding should not be disturbed unless plainly wrong. Suffice to say as to the latter proposition that in this case but little of the evidence of importance was taken by the commissioner, and he did not, therefore, have any better opportunity to judge of the weight of the evidence than the court; and hence the rule insisted upon as to the weight to be given to the findings of the commissioner has little application. So far as the size of the bill is concerned, the fact that the libelants asserted a plainly excessive and exorbitant demand does not com-

mend their cause to the consideration of the court, since by so doing it has caused needless work to be imposed upon the respondent, and unnecessary and unusual cost in court. The entire claim in this case was something over $5,000, and on account thereof the commissioner allowed $3,236.05, and this sum the court reduces to $2,066.06.

It follows from what has been said that the exceptions of the Sovereign of the Seas should be sustained as above indicated, and that an award should be made in behalf of the Juniata for the amount of the four items above named, aggregating $72.40, and for the repair bill of $1,138.66, with interest from the 3d day of November, 1900, until paid, and for demurrage of $855, with interest thereon from the date of the entry of the decree carrying out this decision.